IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

No. 94-50803

CLIFTON EUGENE BELYEU,

                                        Petitioner-Appellant,

                        versus

WAYNE SCOTT, Director, Texas
Department of Criminal Justice,
Institutional Division,

                                        Respondent-Appellee.

Appeal from the United States District Court
for the Western District of Texas

(October 11, 1995)

Before HIGGINBOTHAM, SMITH, and DeMOSS, Circuit Judges.

HIGGINBOTHAM, Circuit Judge:

    Clifton Eugene Belyeu appeals the dismissal of his federal habeas petition seeking relief from a death sentence imposed following a Waco, Texas jury verdict returned on August 8, 1986. The Texas jury convicted Belyeu of robbing and killing Melody Bolton at her home near the town of West, Texas on December 10, 1985.  We affirm.

I

    The Texas Court of Criminal Appeals affirmed Belyeu's conviction and sentence.  Belyeu v. State, 791 S.W.2d 66 (Tex.

Crim. App. 1989). The United States Supreme Court denied certiorari on March 18, 1991. 499 U.S. 931 (1991). Belyeu then filed his state habeas petition. The state trial judge, and the Texas Court of Criminal Appeals in turn, denied relief without an evidentiary hearing. Ex Parte Belyeu, No. 22, 887-01 (Tex. Crim. App. 1992), unpublished. Belyeu then filed his petition for a writ of habeas corpus under 28 U.S.C. § 2254 in the United States District Court for the Western District of Texas, Waco Division. The petition asserted numerous claims, but only two remain in contention before this court:

(1) whether Belyeu received effective assistance of counsel;

(2) whether Belyeu was deprived of an individualized sentencing determination by misconduct of the prosecutor and the trial court's failure to instruct the jury that the law of parties does not apply at the punishment phase of the trial.

The district court rejected all asserted grounds for relief except the claims of ineffective assistance of counsel. It ordered an evidentiary hearing, limited to whether counsel met the standard of objective reasonableness, the first prong of Strickland v. Washington, 466 U.S. 668 (1984), on three assertions of ineffective assistance:

(1) failing to investigate or present evidence in mitigation of psychiatric or neurological disorders;

(2) failing to object to testimony regarding blood patterns and the use of "photogrammetry";

2

(3) failing to investigate the basis of expert testimony offered by the state and to offer testimony challenging it.

The district court sustained the first assertion, rejected the second and third, and ordered a hearing on the remaining question of prejudice resulting from trial counsel's failure to develop this possible mitigating evidence. After considering additional submissions of the parties, the district court found that Belyeu had not demonstrated the level of prejudice required under Strickland and dismissed the petition in its entirety.

II

The district court's careful treatment of this case produced a succinct statement of the fact matrix of the crime and the evidence of Belyeu's guilt at the sentencing phase of the trial:

> At about 9:00 or 9:30 a.m. on the morning of December 10, 1985, Belyeu and Ernest Moore (Belyeu's accomplice who pled guilty to murder and was assessed a life sentence) stopped at Betty Birdwell's Hillsboro home to look at a Corvette she had for sale. They were driving a small light-colored pickup with a camper on it. At about 10:20 or 10:30 a.m., Mary Frances Kolar, who lived one or two miles from the Boltons, saw a small red and white pickup with a camper shell on it come down her driveway, stop, and then back out of her driveway. She noticed two persons were in the truck, but she could not identify them. Two other witnesses, Laura Fry and Molly Brenner, testified to seeing a small red and white pickup truck with a camper shell on it in front of the Bolton residence on the morning of December 10, 1985. The witnesses stated that the pickup was there from at least 10:30 a.m. to at least 10:40 a.m., and it was parked behind Mrs. Bolton's car.
> After being called at work by a friend of Mrs. Bolton's, Mr. Bolton came home around 12:00 p.m. on December 10, 1985. He noticed that some cabinets were open in the garage and the phone was off the hook. He went to get one of his guns, and noticed that they were missing. He then proceeded towards the master bedroom,

3

and found his wife's body lying on the bed.  Her hands were tied behind her back, her feet were hanging off the bed, and it appeared that she was fatally injured.

These witnesses stated that Belyeu was wearing jeans and a western shirt, and Moore was wearing jeans and a white t-shirt.  One man was wearing boots, and the other, high-top tennis shoes, but the witnesses could not remember which man was wearing which.  After conversing 20 to 30 minutes, Belyeu and Moore went next door; a few minutes later, a Cadillac jumped a bar ditch and headed out into the pasture.  While the witnesses were unable to see who was driving the Cadillac, they noticed that it was following the pickup truck driven by Belyeu.

Pamela and Richard Goddard testified that the red and white pickup with camper shell was the same vehicle Belyeu was trying to purchase from them.  Belyeu had been given two keys to the truck, one of which was copper or brass.

When the sheriff's department arrested Belyeu and Moore, the truck and trailer were searched.  The search of the truck revealed a knife with a large amount of blood on the blade, a jeans jacket, and a vest with **five** shotgun shells in the pocket.  On the following day, the sheriffs department searched the area in which tire tracks had been found and discovered some gun bags, a pine jewelry box, and a sawed-off shotgun.  There were blood splatters and brain fragments on the gun.  A brass key to the Ford Courier was also found in the pine jewelry box.  Three other guns were found in the area, as well as additional shotgun shells in the jewelry box.

The autopsy of Mrs. Bolton revealed that she had died of a shotgun blast to the head and multiple stab wounds to her back.  After extensive analysis of blood stains, blood types, and splatter patterns, the State concluded that the stains on Belyeu's clothing were consistent with the pattern throughout the master bedroom.  Expert testimony also revealed that the shotgun pellets that killed Mrs. Bolton were the same type found in the sawed-off shotgun, and the shotgun barrel and stock found in Belyeu's home were consistent with those that would have originally been found on the sawed-off shotgun.  The buck knife found in the Ford Courier was consistent with the stab wounds on the deceased.  The footprints found in the home were consistent with the tennis shoes found in Belyeu's home.

Mr. Bolton identified the three additional guns and the buck knife as belonging to him, and the jewelry box as belonging to the deceased.  The sawed-off shotgun was stolen from Michael Wise's home on November 25, 1985.

III

Strickland v. Washington, 466 U.S. 686 (1984), requires that a claim of ineffective assistance of counsel meet a two-prong test. A petitioner must both demonstrate that counsel's performance was deficient and that the errors were so serious as to "deprive the defendant of a fair trial, a trial whose result is reliable." Id. at 687. When the sentence is challenged, "the question is whether there is a reasonable probability that, absent the errors, the sentencer . . . would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." Id. at 695. The measure of performance is highly deferential, calibrated to escape "the distorting effect of hindsight." Id. At 697. We must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance" and that the "challenged action might be considered sound trial strategy." Id. at 689 (citation and internal quotation marks omitted).

IV

Belyeu contends, in the first two parts of his three part attack upon the effectiveness of his trial counsel, that the federal district court erred in concluding that trial counsel's "failure to conduct any investigation of the State's blood spatter evidence was a strategic decision and thus did not constitute deficient performance" and that this failure did not prejudice him at the punishment phase of the trial. The line of attack is that the decision could not have been strategic because counsel

5

conducted no investigation and "a truly strategic decision cannot be made in a vacuum."  The argument continues that the failure to investigate was prejudicial because the evidence of the blood spatters was the only evidence tending to prove that Belyeu was the trigger man.

The state called Sgt. Rod Englert as an expert witness in the guilt phase of the trial.  Englert expressed the opinion that blood on a denim jacket found in Belyeu's truck was consistent with the blood pattern of the shooter.

It is true that Englert was an expert of considerable experience in this field.  The relevant opinion Belyeu claims his counsel failed to counter, however, was straightforward and uncomplicated, drawing little upon Englert's range of experience.  Englert's opinion about the match of the jacket and jeans was little more than an observation about undisputed physical facts.  The victim was seated on a bed with her hands tied behind her.  She was stabbed repeatedly with a Buck knife later found under the seat of Belyeu's truck.  She was shot in the head at close range with a sawed off shotgun, virtually decapitating her.  Belyeu's jeans were splattered with blood on the left side while the clothes of Moore, his accomplice, was splattered on his right side.  Sgt. Englert explained this evidence as follows:

> Important is the fact that [the blood] is on the same side, on the left side, in a prolongation of  those droplets on the sleeve and so possibly that side of the body was facing the victim when shot.  That being the left side of the hip on the jeans and the left side on the Jean jacket down the left sleeve....  The blue jeans of the Defendant would be more consistent with the jacket because it is on the left side, and as I stated

previously in a prolongation of the left sleeve down on the left side of the body.

The trial counsel, Ables, testified at the first federal evidentiary hearing that he did not recall whether he had consulted with experts, and that his trial strategy aimed for a "no" answer to the question of deliberateness, the first question in the sentencing phase. His cross examination was calculated to leave both Belyeu and Moore as possible shooters. Ables testified that he understood the "blow-back" of gunshot wounds that could put blood on the shooter, and that he didn't hire an expert because he could get the answers he wanted on cross-examination without paying the price of his own expert validating the state's expert on other points. Finally, Ables in his testimony made the point that "[t]here is no great deal of magic to [blood spatter evidence], it's simply the application of physics, and the physical laws generally follow pretty strict lines." The district court concluded that trial counsel "rendered effective legal assistance with respect to blood spatter and photogrammetry evidence. . . . Counsel had strategic reasons not to call defense experts with respect to photogrammetry and blood spatter analysis."

We are not persuaded that any credibility choices of the district judge were clearly erroneous. We review afresh the ultimate conclusion that the decisions by Ables were strategic and objectively reasonable. Our independent reading of the record leads us to the same conclusion as the district court's concerning the strategic character of the decisions behind the defense to the blood spattering evidence. Sgt. Englert's expertise brought little

7

to the table concerning the identity of the shooter that was not self-evident.

The parts of the shotgun left behind when its stock and barrel were sawed off were found in Belyeu's trailer home along with shells with similar loads. Other unrefuted evidence showed that Belyeu owned the shotgun and had sawed off its barrel and stock. The buck knife belonging to Melody Bolton's husband was found under the seat of Belyeu's truck. Trial counsel faced the task of convincing the jury that there was reasonable doubt that Belyeu welded neither the shotgun nor the knife, since both dealt lethal blows. A brief cross-examination that accepted the reality that both Moore and Belyeu were splattered with blood might perpetuate whatever uncertainty over Belyeu's role inhered in the facts with which counsel was stuck. Trial counsel did that, developing on cross examination that blood on Moore's jeans and Melody's Bolton's blood were the same type. As we will explain later in discussing Beleu's claims regarding the "law of parties," there was no constitutional requirement that the state prove that Belyeu was the actual shooter  or that he stabbed Melody Bolton. The state had only to show "major participation in the felony committed, combined with reckless indifference to human life." <u>Tison v. Arizona</u>, 431 U.S. 137,158 (1987). The prosecution's closing argument was geared to this reality. He argued to the jury that, "the blue jeans, I held them up for you the other day, side by side, blood on both of them--Partners in crime. Was his conduct deliberate? Yes, it was. Yes, it was. Whether Ernest Moore pulled the trigger, whether

8

Clifton Belyeu pulled the triggerr makes no difference. The conduct was deliberate." The fact that the prosecutor hedged with this contention reflects the effectivness of the cross examination on the certainty of whether Moore or Beleu was the shooter. The state would have preferred to put the gun or knife in Belyeu's hand, but it was unwilling to allow the case to rise or fall on the issue. That is the reality that we must not lose sight of, lest we fall prey to the seductive call of hindsight. A reading of this record makes plain the objective reasonableness of Able's decisions. We reject this point of error.

Nor are we persuaded, in any event, that Belyeu has shown the requisite prejudice to sustain his attack on the guilt phase of the trial. He offered expert testimony at the federal habeas hearings questioning Sgt. Englert's methods, but that expert declined to express the opinion that the evidence, when analyzed under his own methodology, did not support Sgt. Englert's conclusions. Rather, Belyeu's expert stopped short of that critical defining point, explaining he would have to do more work to arrive at any such opinions. This stop halfway up the hill leaves wholly speculative the assertion that calling this or any other expert would have mattered. It suggests that Belyeu's trial counsel might have been able to secure expert testimony questioning Englert's methods -- but the blood on the jacket and jeans would not change locations. Even after trial with the advantages of hindsight, Belyeu has not offered proof that might have made that location exculpatory.

9

Relatedly, we reject the contention that by these strategic decisions Belyeu suffered the prejudice demanded by <u>Strickland</u> at the sentencing phase. As we will explain, the state offered evidence at the sentencing phase of Belyeu's violent nature. It is difficult to believe that any residual doubt concerning Belyeu's participation with reckless indifference to life that may have remained in the jury's minds after the guilt phase survived this potent evidence.

V

The federal district judge held that Belyeu's trial counsel failed to deliver constitutionally adequate service in the sentencing phase of the trial. The court found that trial counsel did not consult with mental health professionals to determine if Belyeu suffered from psychiatric or organic disorders and thus did not discover or present evidence of Belyeu's alleged brain impairments. The district court concluded, however, that this failure did not prejudice Belyeu. Belyeu challenges the latter conclusion.

-1-

We review <u>de novo</u> the district court's determination of prejudice. "[B]oth the performance and prejudice components of the ineffectiveness inquiry are mixed questions of law and fact." <u>Strickland</u>, 466 U.S. at 698. We ask if there is a "reasonable probability that, but for counsel's unprofessional errors, the

result of the proceeding would have been different." Id. at 694. Strickland explained that "[t]he result of a proceeding can be rendered unreliable, and hence the proceeding itself unfair, even if the errors of counsel cannot be shown by a preponderance of the evidence to have determined the outcome." Id.

-2-

We turn to the evidence presented to the jury at the sentencing phase before returning to the challenges to the competence of trial counsel's performance in that part of the trial. The state relied upon a history of violence. Belyeu now contends that evidence of head injuries, his abuse as a child, and his "significant" impairment of mental acuity, coupled with evidence of organic impairment of brain function from use of drugs and alcohol, would have at least taken the edge from the state's evidence of his violent disposition.

The state offered evidence at the sentencing phase that Belyeu had been convicted in 1979 of robbery and that he had burglarized a residence and had stolen property on at least two additional occasions. Two state witnesses described Belyeu's abuse of his wife, Donna. They testified that Belyeu frequently beat Donna, leaving her with black eyes and other injuries so severe that on one occasion she could barely walk. He administered similar abuse to Shirley Kay Carver, his girlfriend, beating and kicking her. On one occasion he attempted to strangle her while she was asleep in bed. When she attempted to escape, he ripped off all her clothes, dragged her outside, and, while holding her by the hair with his

11

knee in her back, made her "eat the dirt." Her face was "busted up" and she was bleeding. She managed to climb a tree where, still naked, she remained until Belyeu fell asleep. Carver testified that he slapped her while she was holding her two year-old daughter. When the baby began screaming, he hung the baby by the hair from the second floor of a two-story house. When Carver grabbed for her, Belyeu released the child but Carver managed to catch her "by the hands of God." Carver also told the jury that while driving in Texas, Carver had a pet parakeet in a cage in their truck. When she asked Belyeu not to drive so fast, he seized the bird, ripped its head from its body, threw the bird's body from the truck, and made Carver finish the trip with the bird's head in her lap. She explained that she was afraid to leave Belyeu because he threatened to kill her and her family if she did.

Two of Belyeu's sisters testified that he was one of eight children raised by their mother with welfare money and that the father went to prison for raping one of his sisters. They also testified that he mowed yards, washed dishes, and waited tables at the restaurant where their mother worked, that he was willing to work, and that he was a good drywaller. The sisters denied having seen Belyeu hit anyone and stated that he had a good relationship with siblings.

-3-

The federal district court held:

> Mr. Ables and Mr. Horner did not provide representation consistent with prevailing professional norms and an objective standard of reasonableness in this particular case in [that] they did not investigate

12

Petitioner's mental health background after Dr. Gordon raised the possibility that Mr. Belyeu had a "neurological impairment" or after they became aware that (1) Mr. Belyeu's family had a history of mental disorders, (2) Mr. Belyeu had medical problems as a child and an adult, (3) Mr. Belyeu had suffered numerous head injuries, (4) Mr. Belyeu had a noticeable scar on his head, (5) Mr. Belyeu had a troubled family history, was possibly the victim of physical abuse as a child, and that his father had raped Mr. Belyeu's sister, (6) Mr Belyeu had attempted suicide while in jail, (7) Belyeu had told acquaintances he was possessed by demons, and (8) Mr. Belyeu had a history of past violence and anger, especially when he was under the influence of narcotics or alcohol." ( Conclusion of law 3/28/94)

Belyeu offered evidence of his claimed brain impairment at the second federal habeas hearing through the testimony of two experts, Dr. Robert Geffner, a clinical psychologist, and Paula Lundberg-Love, a licensed chemical dependency counselor.  Geffner testified that Belyeu suffers from mild neuropsychological impairment attributable to closed head injuries or polysubstance abuse, or both, and that at the time of the murder Belyeu was "probably" suffering from moderate neuropsychological impairment.  Lundberg-Love testified that a high probability existed that Belyeu suffered from "significant" brain damage and behavioral impairment.  However, she used the word significant only in the statistical sense.  That is, she used a mathematical term that was of little relevance.  The state countered with Dr. Hom, a licensed psychologist, who concluded that Belyeu does not currently suffer from mild neuropsychological impairment and did not at the time of the murder.  He expressed the view that the opinions of Geffener and Lundberg-Love were based on improper procedures, inaccurate scoring, and over-interpretation.  The district court found that

13

there was "no evidence to corroborate closed head injuries resulting in any mild organic brain disorder, or mild organic brain disorder brought about by substance abuse." Belyeu attacks this conclusion as irrelevant. He argues that it was not the role of the federal habeas court to resolve the dispute among the experts and decide as an ultimate fact the extent of any impairment Belyeu may have suffered. Rather, he contends, the evidence supports his contention that the proceedings were made unreliable by the failure of trial counsel to adduce this evidence before the jury at the sentencing phase because this evidence went directly to whether Belyeu committed the murder with deliberateness.

-4-

We agree with Belyeu's criticism of the federal habeas court's finding or, more precisely, the use of the finding, but we agree only in part. It is true that it was not the district court's task to resolve the dispute. The court's task was to see what evidence might have been adduced and to gauge any prejudice resulting from trial counsel's failure to present it. The rejection of the evidence is relevant because it casts doubt on its persuasiveness and hence its force before the jury.

We do not, however, rest on this conclusion alone. Trial counsel expressed his judgment that the jury would be skeptical of such opinions in the context of this trial. He explained that Belyeu was articulate and helpful in the preparation of the defense. The experts would have been forced to concede that Belyeu knew what he was doing. Even if the jury had credited the experts'

14

opinions, itself a large assumption, it could only have concluded that Belyeu had some impairment, described as mild or moderate, not significant in the ordinary sense of that word. How this evidence might have played to Belyeu's advantage on the question of deliberateness is difficult to comprehend. If the jury believed Belyeu fired the shotgun, used the knife, or otherwise participated with reckless indifference to the taking of Melody Bolton's life for no reason except to eliminate the helpless woman as a witness, we are not persuaded that the asserted failure of trial counsel to adduce the evidence garnered later would have made any difference. No other reason for the slaying is offered. This evidence shed no light on the identity of the shooter, at least any that was exculpatory.

The state made the powerful point that Melody Bolton did not become a victim because she was the happenstance witness to burglary. Belyeu and Moore blocked Melody Bolton's car in the driveway by parking the truck immediately behind it when the garage door opened. That is, Belyeu and Moore could have waited until her departure and then entered the Bolton house. They did not do so, electing instead to take her hostage. There was also evidence, including a swing set and other toys, that Belyeu must have known that Melody was the mother of small children. The prosecution pointed this evidence out to the jury in the photographs taken at the crime scene. In short, we cannot say that Belyeu's trial counsel's failure to present the mitigating evidence now advanced undermines the reliability of the jury's sentence.

15

Belyeu contends that the state trial court committed constitutional error in refusing his request to instruct the jury that the "law of parties" does not apply at the sentencing phase of the trial. The contention is that the jury was allowed to answer "yes" to the two questions posed at the sentencing hearing without finding that Belyeu did more than aid and abet the murder. Pointing to colloquy in <u>voir dire</u> and to the state's final argument, he contends that trial rulings deprived him of the individualized sentencing decisions due under the Eighth Amendment because the jury was not cabined in its deliberations to Belyeu's "personal responsibility and moral guilt" as required by <u>Enmund v. Florida</u>, 458 U.S. 782, 801 (1982). <u>Tison v. Arizona</u>, 431 U.S. 137, 158 (1987), makes plain that "major participation in the felony committed, combined with reckless indifference to human life, is sufficient to satisfy the <u>Enmund</u> culpability requirement."

Counsel objected to the failure to instruct the jury at the punishment phase "that only the conduct of the Defendant can be considered in determining the answer to said [the first] issue, and that the instructions pertaining to the law of the parties at the guilt/innocence phase cannot be considered." The objection was overruled. The Texas Court of Criminal Appeals found no error in refusing this instruction, concluding that, viewing the charge as a whole in light of the evidence, there was no danger the jury was misled. <u>Belyeu</u>, 791 S.W.2d at 74. That court also found that if there was any error, Belyeu suffered no actual harm. The federal

16

district court agreed, pointing out that the "first special issue focuses the jury's attention on the individual defendant by asking if 'the conduct of the defendant was committed deliberately and with the expectation that death would result.'  It includes the required Enmund finding of individual culpability."  The federal district judge continued that "in light of the fact that Belyeu's counsel clearly articulated to the jury that the law of the parties does not apply at the punishment phase," there was no fundamental error.

We agree with the two courts below that have considered and rejected this contention.  We are not persuaded that the voir dire questioning, the final arguments, or the court's charge to the jury carried a risk of misleading the jury that it could answer affirmatively the questions put to it in the punishment phase even if it harbored a reasonable doubt as to whether Belyeu's participation evidenced the reckless indifference to life required by Enmund and Tison.  Belyeu's contention is made at a level of generality about the law of parties that frees it from the difficulties of confronting the facts of this case.  Much of the effort at trial would have been baffling to a jury who labored under the delusion that it was not necessary to find that Belyeu's role, as shooter, as the stabber, or as assistant to Moore who did both, was not  at the least coupled with reckless indifference to the killing of Melody Bolton.  The point is that the lines of engagement at trial, the arguments of counsel, and the court's instruction, give a sure answer to this final contention by Belyeu.

17

The instruction given to the jury included the following:

The mere presence of the defendant, Clifton Eugene Belyeu, at the scene of the offense charged, if any would not constitute him a party to the offense charged, and if you should find from the evidence beyond reasonable doubt that Ernest Ray Moore did then and there intentionally kill Melodie Bolton, as alleged in the indictment aforesaid and that he was then and there in the course of committing or attempting to commit Robbery, as alleged, of the said Melodie Bolton, but you further find or believe from the evidence, or you have a reasonable doubt thereof, that the defendant, Clifton Eugene Belyeu, did not act with intent to promote or assist the commission of said offense of murder by shooting or stabbing Melodie Bolton while in the commission of robbing or attempting to rob her, if any, by encouraging, soliciting, directing, aiding, or attempting to aid Ernest Ray Moore in the commission of the offense, then you will find the defendant, Clifton Eugene Belyeu, not guilty of capital murder.

There was more:

Now, if you believe from the evidence beyond a reasonable doubt that on or about the 10th day of December, 1985, in McLennan County, Texas, the defendant, Clifton Eugene Belyeu, acting alone or together with Ernest Ray Moore as a party intentionally caused the death of an individual, Melodie Bolton, by stabbing her with a knife or shooting her with a firearm and that the said Clifton Belyeu was in the course of committing or attempting to commit Robbery, of the said Melodie Bolton, then you will find Clifton Eugene Belyeu guilty of Capital Murder as charged in the indictment.

Unless you find from the evidence beyond a reasonable doubt thereof, you will acquit the defendant.

We reject each of Belyeu's contentions and affirm the district court's dismissal of his petition for habeas corpus.

AFFIRMED.

18