# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

July 7, 2008

Charles R. Fulbruge III
Clerk

No. 08-70002

FRANK MOORE,

Petitioner-Appellant,

v.

NATHANIEL QUARTERMAN, Director,
Texas Department of Criminal Justice, Correctional Institutions Division,

Respondent-Appellee.

Appeal from the United States District Court
for the Western District of Texas
No. SA-03-CA-405-RF

Before REAVLEY, SMITH, and BARKSDALE, Circuit Judges.

JERRY E. SMITH, Circuit Judge:

Frank Moore was convicted of capital murder and sentenced to death. The district court denied federal habeas corpus relief. Because no "reasonable jurist[] would find the district court's assessment of the constitutional claims debatable

or wrong," Miller-El v. Cockrell, 537 U.S. 322, 338 (2003) (internal citations and quotations omitted), we deny Moore's request for a certificate of appealability ("COA").

I.

A Texas jury convicted Moore of killing Samuel Boyd, 23, and Patrick Clark, 15, after an altercation in the parking lot of the Wheels of Joy Club in San Antonio around 2:00 one morning in January 1994. The state's key witness was Angela Wallace, who met Moore that night at the club and who knew Boyd and Clark. Wallace testified that Boyd and Clark arrived at the club after she did and acted in a socially appropriate manner and that there was no overt hostility between them and Moore—in fact, she reported that Boyd and Moore even shook hands and shared a laugh. Near closing time, however, Wallace watched Ivory Sheffield, apparently one of Moore's friends, whisper something to Moore, after which Moore and Sheffield left the club.

When Wallace exited to the parking lot, she saw a confrontation involving Moore, Boyd, Clark, and another man. She recounted that after the initial encounter, the men scattered, then Boyd and Clark returned in a white car and parked next to Moore, who walked to the back of the car. Wallace neither saw nor heard Boyd or Clark make any threats. Nonetheless, after Sheffield tossed him a rifle that had been in the trunk of a nearby car, Moore started shooting into the white car, discharging between six and ten rounds, killing Boyd and Clark. Moore returned the rifle to Sheffield, got into a car, and left, with Sheffield saying, "Who else wants some of this?"

A medical examiner testified that Boyd and Clark died of multiple gunshot wounds and that the condition of the bodies was consistent with their being in

the car when shot, with the gunman standing toward the vehicle's rear.[1] An investigator at the scene found shell casings in a spot that suggested that the shots were fired into the car from the left rear of the vehicle.[2]

## II.

Moore was convicted of capital murder and sentenced to death, but his conviction was vacated by the Texas Court of Criminal Appeals ("CCA") on the ground that he was entitled to the inclusion of a pair of lesser included offenses in his jury charge. See Moore v. State, 969 S.W.2d 4, 6 (Tex. Crim. App. 1998).

In his second trial, Moore called Robert Mays, a friend, as a witness. Mays claimed to be at the club that night and said that he observed the scuffle in the parking lot. He heard yelling about guns and saw two or three men run across the street and jump into a white car whose driver tried more than once to run down Mays, Moore, and others. The men in the car spoke about shooting Mays, and if Moore had tried to run away from the altercation, they would have shot him. Mays saw guns in the white car, including a rifle. He escaped before those in the car were killed, so he did not see whether Moore fired the fatal shots.[3]

The jury again convicted Moore of capital murder in 1999. During the sentencing phase, the state offered evidence that he had been convicted in the past

---

[1] The medical examiner also stated that Boyd and Clark were acutely intoxicated.

[2] Barbara Boyd, Clark's older sister and Boyd's sister-in-law, testified that she was told of the shooting and arrived at the scene, tried to wake up Boyd, then called for medical help and the police. At no time did she see anyone going through the white car or touching the bodies.

[3] The district court observed that Mays's testimony was internally inconsistent. He stated, for instance, that Moore was in the club when the white car tried to hit Mays, but he also said that Moore was outside when it happened. Mays also claimed that he left before any shots were fired but also that the men in the white car fired at least six shots at him while he fled. To explain himself, he testified that first the car tried to hit him, then he went into the club before shots were fired, then he left the club a second time, and then the people in the white carSSwho by that time had exited the carSSstarted shooting at him as he ran home.

of negligent homicide, attempted murder, and drug possession and delivery. A police officer also testified that Moore had been arrested for an unrelated matter shortly before he was arrested for the murders of Boyd and Clark and that during the first arrest, Moore was carrying a revolver in his waistband, and that the officer personally had arrested Moore for being a felon in possession of a firearm on yet another occasion. Moore was a member of the violent East Terrace Gangsters and was the "sergeant-at-arms" for the Black Panthers who was responsible for procuring, hiding, and distributing weapons. While incarcerated, Moore took an active role in a race riot, attacked a guard, and was violent in other ways and had been a member of the Crips gang since he was fourteen.

At sentencing, Moore only[4] offered the testimony of Frederick BuhlerSSwho also had been at the club that nightSSthat though he personally witnessed Moore shoot Boyd and Clark five or six times, Moore did not provoke the incident and that Boyd and Clark had a chance to leave "a long time" before being killed but did not. Though he testified that the white car "skid[ded] across the street and stop[ped] once, and then it [came] back again and it stop[ped] again," such that "[a]t that time it was within inches of [his] leg," Buhler did not say that Boyd and Clark began shooting at Moore before he killed them or that there were any weapons in the car.

The jury found that there was a probability that Moore would commit criminal acts of violence in the future and that there was insufficient mitigating evidence to support a sentence of life imprisonment, so he was sentenced to death. The CCA affirmed, Moore v. State, No. 73,526 (Tex. Crim. App. Jan. 9, 2002), and Moore did not petition for writ of certiorari. He filed a state habeas corpus application asserting thirty-five grounds for relief. At the hearing, he proffered no witnesses and presented no evidence; his lawyer said that the "alle-

---

[4] Outside of the jury's presence, Moore expressly advised the court on the record that he did not want his attorney to present any additional mitigating evidence.

gations are established in the brief or in the writ . . . ." In February 2003, the state habeas court issued an order containing its factual findings and legal conclusions, recommending that Moore's application be denied, and the CCA adopted the recommendation. Ex parte Moore, No. 40,046-02 (Tex. Crim. App. May 14, 2003).

Moore petitioned for federal habeas corpus relief in March 2004. In November 2004, the district court granted his motion for a stay and to hold his petition in abeyance so he could return to state court and exhaust a claim under Atkins v. Virginia, 536 U.S. 304 (2002), but the court ordered Moore to file his state application within sixty days. In August 2005, the court directed the parties to advise it regarding this successive application, and the state reported that Moore had not yet filed it. In October 2005, Moore responded to the August order, stating that he intended to pursue a claim under Brady v. Maryland, 373 U.S. 83 (1963), but he said nothing about an Atkins claim.

In January 2006, the state moved to lift the stay, informing the district court that Moore, who already had participated in numerous mental health examinations, had scheduled another exam for February. The court ordered Moore to explain why the stay should not be lifted. Moore responded by saying that the stay was necessary so that he could exhaust his Brady claim, but he did not explain his lackadaisical prosecution of his Atkins claim.

In August 2006, the court lifted the stay and ordered Moore to file his amended petition within thirty days, but Moore did not. In September, the court ordered Moore to show cause for the delay; Moore replied by filing his amended petition, asserting twenty-two claims, none addressing Atkins. The state responded to the amended petition in January 2007, and Moore replied in May.

In March 2006, Moore again applied for state habeas relief, asserting that state prosecutors and police had violated his rights under Brady. The CCA rejected that successive application as an abuse of the writ. Ex parte Moore, No.

40,046-03 (Tex. Crim. App. Sept. 13, 2006). In December 2007, the district court denied relief on all claims, and in January 2008 it declined to grant a COA.

## III.

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), a petitioner, as a matter of subject matter jurisdiction, Miller-El, 537 U.S. at 335-36, must secure a COA to appeal the denial of habeas relief, and a COA will be granted only if he can make "a substantial showing of the denial of a constitutional right," 28 U.S.C. § 2253(c)(2). We conduct a "preliminary, though not definitive" evaluationSSa so-called "threshold inquiry"[5]SSof the petitioner's arguments and must issue a COA if "reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." Miller-El, 537 U.S. at 336, 338 (internal citations and quotations omitted).

"[A] claim can be debatable even though every jurist of reason might agree, after the COA has been granted and the case has received full consideration, that petitioner will not prevail." Id. at 338. Importantly, however, "issuance of a COA must not be pro forma or a matter of course," and "a prisoner seeking a COA must prove 'something more than the absence of frivolity.'" Id. at 337-38 (quoting Barefoot v. Estelle, 463 U.S. 880, 893 (1983)). In death penalty cases, any doubts as to whether the COA should issue are resolved in favor of the petitioner. See Lamb v. Johnson, 179 F.3d 352, 356 (5th Cir. 1999).

Under general principles of federal habeas law, no relief can be granted on "any claim adjudicated on the merits by a state court unless the state decision was contrary to, or an unreasonable application of, clearly established federal law as determined by the Supreme Court, or if the state court's determination

---

[5] See Miller-El, 537 U.S. at 336-37 ("This threshold inquiry does not require full consideration of the factual or legal bases adduced in support of the claims. In fact, the statute forbids it.").

of facts was unreasonable in light of the evidence." Thompson v. Cain, 161 F.3d 802, 805 (5th Cir. 1998) (citing 28 U.S.C. § 2254(d)).[6]  A state court decision is "contrary to . . . established federal law" if it "applies a rule that contradicts governing law set forth in [Supreme Court precedent]" or if it "confronts a set of facts that are materially indistinguishable from a decision of [the] Court and nevertheless arrives at a result different from . . . precedent."  Williams v. Taylor, 529 U.S. 362, 405-06 (2000).  Likewise, "[a] state-court decision that correctly identifies the governing legal rule but applies it unreasonably to the facts of a particular prisoner's case certainly would qualify as a decision 'involv[ing] an unreasonable application of . . . clearly established Federal law.'"  Id. at 407-08. Where the district court has rejected a claim on a procedural ground, "the petitioner must also demonstrate that jurists of reason would find it debatable whether the district court was correct in the procedural ruling."  Henry v. Cockrell, 327 F.3d 429, 431 (5th Cir. 2003) (internal citations and quotations omitted).

## IV.

Moore claims that state officials withheld evidence favorable to his cause, both as to guilt and punishment,[7] contrary to Brady.  "To establish a Brady violation, a defendant must make three showings:  'The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued.'"  United States v. Sipe, 388

---

[6] See also Schriro v. Landrigan, 127 S. Ct. 1933, 1939 (2007) ("The question under AEDPA is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonableSSa substantially higher threshold.").

[7] The government argues that Moore did not raise a punishment-related Brady claim in the district court.  We need not decide whether that argument is waived, however, because it is meritless for the reasons stated below.

F.3d 471, 477 (5th Cir. 2004) (quoting Strickler v. Greene, 527 U.S. 263, 281-82 (1999)). For evidence to be materially prejudicial, "[t]he question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." Kyles v. Whitley, 514 U.S. 419, 434 (1995). We ask, therefore, whether "the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." Id. at 435. "In short, [a defendant] must show a 'reasonable probability of a different result.'" Banks v. Dretke, 540 U.S. 668, 699 (2004) (quoting Kyles, 514 U.S. at 434).

In his successive state habeas application, Moore offered an affidavit from Warren Huel, the owner and operator of a pair of security companies. Huel claimed he had "professional contact[s]" with Moore, Boyd, Clark, and Ernest BedfordSSall individuals that he had heard were involved in the sale of crack cocaine. Bedford, according to Huel, "bragged to all who would listen that he and his crew were going to rob or kill" Moore. Huel also said that Boyd, Clark, and Bedford were dangerous and had even beaten a man to death "several month [sic] prior to the incident of 21 Jan 1994," an event "witnessed by 40-50 youths [of whom] none would stand as witness against Bedford and associates."

The affidavit stated that on the night of the killings, before the police arrived but after the shooting was over, some of Huel's security-company employees interviewed witnesses and learned that in the hours leading up to the killings, Boyd, Clark, and others had tried to murder Moore in a drive-by shooting and that at the club Bedford "let the crowd know that he was armed and continued to menace Moore." His employees also allegedly told him that Boyd and Clark were reported to have had handguns in the white car and that before Moore started shooting, Bedford exited the car with a handgun. Sheffield then brought an M-1 rifle to Moore, but Moore did not begin firing until after Bedford

fired a shot. In fact, according to Huel's affidavit, his employees told him that they had learned from undisclosed witnesses that instead of firing first, "Moore [merely] returned fire and silenced the gunfire coming from the vehicle."

Then, according to the affidavit, after the shooting ended, bystanders removed the handguns used by Boyd and Clark. Huel speculates that bystanders removed Bedford's pistol that was allegedly hidden under a pool table in the club but was not found despite attempts to locate it (thereby depriving Moore of physical evidence). According to Huel, after he learned that a warrant had been issued for Moore, he informed police [8] that Boyd, Clark, and Bedford had fired at Moore and that bullet holes in the building behind Moore confirmed that account but that he was told that what he had to say did not matter, because "Moore was a dope dealer and had to go to jail."[9]

The CCA denied Moore's successive state habeas application as an abuse of the writ. Ex parte Moore, No. 40,046-03 (Tex. Crim. App. Sept. 13, 2006). The district court also denied federal habeas relief, listing three reasons: first, that this claim was procedurally defaulted; second, that it was barred by the statute of limitations; and third, that it lacked merit in any case. The district court's assessment was undebatably correct, though we do not reach the limitations issue.

## A.

No reasonable jurist could argue that Brady was violated. The informa-

---

[8] Whether Huel spoke with the police is a factual question that does not appear to be answered in the record. All that we have is his affidavit. For purposes of this COA application, we assume that Huel told the police what he claims in the affidavit to have told them.

[9] Moore argues that not only did police officers fail to disclose Huel's statement to Moore, they also intimidated Huel such that he did not come to Moore sooner with the information. Moore, however, offers no evidence, or even intimation of evidence, of intimidation. The closest thing to threats in the affidavit are the statements that Huel's information "did not matter" and "Moore was a dope dealer and had to go to jail." If those are threats, they are heavily veiled.

tion in Huel's affidavit always was available to Moore, because the affidavit in all material respects concerned alleged facts that, if true, Moore already knew. The government did not withhold material evidence, because Moore necessarily knew that Boyd and Clark were shooting at him when he killed them, if that was the case, because Moore was there and witnessed what happened. Moore thus could have investigated and located witnesses to support his self-defense claim, even without Huel's information,[10] and "[u]nder Brady, the prosecution has no obligation to produce evidence or information already known to the defendant, or that could be obtained through the defendant's exercise of diligence." Castillo v. Johnson, 141 F.3d 218, 223 (5th Cir. 1998).[11]

It is consequently not debatable that the government's failure to inform Moore of Huel's statement did not violate Brady, because Huel only gave the police information that, if true, Moore should have already known or should have obtained by his own reasonable investigation.[12] It is not enough, as Moore claims, that it is theoretically possible that had the police told him about Huel's hearsay-within-hearsay account of the shooting, he potentially might have scoured more diligently than he otherwise would have (based on his own knowl-

---

[10] Moore, as part of a reasonable defense investigation, also potentially could have contacted Huel directly, especially if Huel and Moore "had ample opportunity to come into professional contact" with each other, as stated in Huel's affidavit.

[11] See also Brown v. Cain 104 F.3d 744, 750 (5th Cir. 1997); United States v. Roane, 378 F.3d 382, 402 (4th Cir. 2004) ("Tipton asserts that the prosecutors knew of, and yet also failed to disclose, statements by the witnesses . . . providing Tipton an alibi on the night of the Stoney Run murders. Tipton's Brady claims must fail, however, because, where the exculpatory information is not only available to the defendant but also lies in a source where a reasonable defendant would have looked, a defendant is not entitled to the benefit of the Brady doctrine. We have explained that information actually known by the defendant falls outside the ambit of the Brady rule. Obviously, Tipton knew who he was with on the evening of the Talley murderSShe had no need for the Government to provide him with such information. Thus, no Brady violation has been shown, and we affirm the district court's ruling on the issue.") (internal citations and quotations omitted).

[12] Moore, for instance, could have looked at the building to see if there were bullet holes in it consistent with Boyd's and Clark's firing first (or at all).

edge that he was innocent) and might have found a witness with admissible evidence.

The highly speculative theorySSthat knowledge of Huel's thirdhand statement would have led Moore to find helpful evidence that his own reasonably conducted investigation would not also have discovered and that he has not been able to find after receiving Huel's informationSSdoes not satisfy the materiality requirement of Brady, because it is insufficient to "show a 'reasonable probability of a different result.'" Banks, 540 U.S. at 699 (quoting Kyles, 514 U.S. at 434).[13] It is undebatable, therefore, that the state's conduct did not unconstitutionally "undermine confidence in the verdict." Kyles, 514 U.S. at 435.

## B.

Even if there were room for debate as to Brady, no reasonable jurist could find it debatable that Moore's claim is not procedurally defaulted. Because an "important interest in finality [is] served by state procedural rules, and . . . significant harm to the States . . . results from the failure of federal courts to respect them," procedural default occurs where a state court expressly bases its dismissal of a claim on an independent and adequate state procedural ground.

---

[13] Moore offered Buhler's eyewitness testimony at sentencing, and that testimony contradicts the third-hand tale recounted in Huel's affidavit. BuhlerSSMoore's own witness, and one who was actually at the sceneSStestified that Boyd and Clark should have left "a long time" before Moore started shooting, but he said nothing about Boyd's, Clark's, and Bedford's shooting at Moore first. This is in accord with the testimony of Walker, the government's eyewitness. The testimony of these two eyewitnesses further supports a conclusion that the state's failure to disclose Huel's statement does not undermine confidence in the verdict.

Huel's information, which was not based on personal knowledge, would have been important at trial only if Moore could find a witness that could testify convincingly that Moore acted in self-defense. But the fact that two independent people testified that Moore did not act in self-defense tends to suggest that no witness exists who could testify otherwise; Moore has not found one, even after receiving Huel's information. Given that Moore personally knows much about what happened that night, but that his investigation has failed to produce a witness that could say that he acted in self-defense, it is unlikely that such a witness exists.

Coleman v. Thompson, 501 U.S. 722, 750, 735 n.1 (1991). Here, the CCA explicitly dismissed Moore's successive application (where he first raised Brady) as an abuse of the writ, and "Texas's abuse of the writ doctrine is a valid state procedural bar foreclosing federal habeas review." Coleman v. Quarterman, 456 F.3d 537, 542 (5th Cir. 2006), cert. denied, 127 S. Ct. 2030 (2007).

The question, thus, is whether Moore can show "cause and actual prejudice" for his failure to comply with Texas's procedures, or that a refusal to address the merits of his Brady claim would result in a "fundamental miscarriage of justice." Thompson, 501 U.S. at 750. To show "cause," Moore must establish that an external factor objectively impeded his ability to comply with Texas's procedural rule. Id. at 753. To show "actual prejudice," he must establish "not merely that the errors at his trial created a possibility of prejudice, but that they worked to his actual and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." United States v. Frady, 456 U.S. 152, 170 (1982); see also Smith v. Quarterman, 515 F.3d 392, 403 (5th Cir. 2008).

It is undebatable that Moore cannot satisfy the cause and actual prejudice standard. The information in Huel's affidavit always was available to Moore, for reasons already stated. Moore, thus, cannot establish that any assumed Brady violation "worked to his actual and substantial disadvantage, infecting his entire trial with error of constitutional dimensions" or that there was a reason why he did not present evidence of the type mentioned in the affidavit. The suggestion that if Moore had known about Huel, he might have then been able to locate a corroborating witness that he would not have otherwise found as part of his own investigation is far too speculative to satisfy the "actual prejudice standard," because "merely [establishing] that the errors . . . created a possibility of prejudice" unequivocally is not enough.

Moreover, no reasonable jurist could debate that Moore cannot satisfy the "miscarriage of justice" exception to procedural default. See Thompson, 501 U.S.

at 750. If Moore could show "actual innocence," by means of "new reliable evidenceSSwhether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidenceSSthat was not presented at trial,"[14] then that also could serve as an exception to the procedural-default doctrine, Schlup v. Delo, 513 U.S. 298, 324 (1995), but we note how "narrow" this exception is: "The Supreme Court consistently has employed the cause and prejudice test, even for 'constitutional claims that call into question the reliability of an adjudication of guilt,' expressing its confidence that the cause and prejudice standard is adequate to protect against miscarriages of justice." United States v. Shaid, 937 F.2d 228, 236 (5th Cir. 1991) (en banc) (quoting Murray v. Carrier, 477 U.S. 478, 495-96 (1986)).[15] Were we not to preserve this separate "miscarriage of justice" exception "for [only] 'an extraordinary case, where a constitutional violation has probably resulted in the conviction of one who is actually innocent,'" we would "undermine the proper finality of criminal convictions" and "eviscerate the cause prong of the cause and prejudice test . . . ." Id. (quoting Carrier, 477 U.S.

---

[14] In assessing actual innocence, we must assess more than just the new evidence:

> [T]he habeas court must consider all the evidence, old and new, incriminating and exculpatory, without regard to whether it would necessarily be admitted under rules of admissibility that would govern at trial. Based on this total record, the court must make a probabilistic determination about what reasonable, properly instructed jurors would do. The court's function is not to make an independent factual determination about what likely occurred, but rather to assess the likely impact of the evidence on reasonable jurors.

House v. Bell, 547 U.S. 518, 537-38 (2006) (internal citations and quotations omitted). Moore offered very little evidence at trial, primarily the testimony of Mays, who said he was not there when Moore began shooting, and Buhler, who did not testify that Moore acted in self-defense.

[15] In Schlup, 513 U.S. at 323-24, the Court held that the lower Carrier "probably" standard applies in death penalty casesSSas opposed to the higher "clear and convincing evidence standard" in Sawyer v. Whitley, 505 U.S. 333, 336 (1992).

at 496) (emphasis added).[16]

The district court's assessment of Moore's argument is undebatably correct: "At best, the 'newly discovered' information . . . consists of hearsay within hearsay statements made by unidentified persons to unidentified employees . . . and address matters which, by their very nature, were within the personal knowledge of the petitioner . . . ." This is not the type of evidence that, if excluded, a miscarriage of justice would result, especially given that "there is no presumption of innocence at a habeas proceeding." Bosley v. Cain, 409 F.3d 657, 664 (5th Cir. 2005).[17]

Not only was the information in Huel's affidavit not "new" (given that it was always within the reach of Moore's personal knowledge or reasonable investigation), it also hardly counted as "evidence," given that it almost entirely consisted of inadmissable hearsay, and, importantly, it was vague to boot, lacking any specificity as to the identity of any particular witness.[18] The thirdhand information in Huel's affidavit likewise was contrary to the accounts of two eyewitnesses, Walker and Buhler, which further undermines Moore's claim that any "constitutional violation has probably resulted in the conviction of one who is ac-

---

[16] This standard is so stringent that it "does not merely require a showing that a reasonable doubt exists in the light of the new evidence, but rather that no reasonable juror would have found the defendant guilty." Schlup, 513 U.S. at 329. "To establish the requisite probability, the petitioner must show that it is more likely than not that no reasonable juror would have convicted him in the light of the new evidence." Id. at 327.

[17] To show "actual innocence," as with showing "actual prejudice," requires something more than pointing to "[a] mere possibility of prejudice," because a speculative claim "will not satisfy the actual prejudice prong of the cause and prejudice test, much less demonstrate actual innocence." Shaid, 937 F.2d at 236 (emphasis added).

[18] Though "[i]n assessing the adequacy of petitioner's showing . . . the district court is not bound by the rules of admissibility that would govern at trial," the court is permitted to consider the "unreliability" of the proffered evidence. Schlup, 513 U.S. at 327-28 (internal citations and quotations omitted). In assessing Huel's affidavit, reasonable jurists would not debate that the persuasiveness of the affidavit should be discounted, because it consists primarily of vague third-party statements.

tually innocent." Carrier, 477 U.S. at 496. Because the best source of Moore's self-defense argument is and always has been Moore himself, no reasonable jurist could debate that his Brady claim is procedurally defaulted and that no exception to the procedural-default doctrine permits federal review of this claim.[19]

## V.

Moore requests a COA based on several comments uttered during his second trial that referred to his first trial. From them, he claims that the state trial court's decision to deny his motions for a mistrial violated his right to a presumption of innocence. No reasonable jurist could find it debatable that Moore's constitutional rights were not violated.

During the guilt phase of the second trial, police officer Steven Patterson testified as follows on cross-examination:

Q. Now, you have no idea what Officer Glen testified to in front of this jury about what the scene looked like when he arrived, do you? Because you were outside and you were under the Rule; is that right?

A. Yes, sir.

Q. So then whatever he told the jury about what the scene was like when arrived, you have no idea what he told them, correct?

A. Other than what I've heard over the past five years.

---

[19] Moore also argues that it contravenes the Eighth Amendment to sentence him to death, because he is actually innocent of the crime. Though acknowledging that this argument is "inextricably linked" to his Brady claim, he offers it as a separate reason a COA should issue. This is wrong, and undebatably so. "Herrera [v. Collins, 506 U.S. 390 (1993)] does not overrule previous holdings (nor draw them into doubt) that a claim of actual innocence based on newly discovered evidence fails to state a claim in federal habeas corpus." Lucas v. Johnson, 132 F.3d 1069, 1074 (5th Cir. 1998). In any event, undebatably, Moore in no way can show that he is actually innocent.

Q.     But as far as today?

A.     No, sir.

Q.     And you are aware, are you not, that Officer Glenn has never testified in any court proceeding or anything involving this case?

A.     I wouldn'tSSI wasn't sure if he testified in the last trial, or not.

Q.     Now, do you know an Officer Reyes, probationary Officer Reyes, who was there that night?

A.     I justSSI couldn't pick him out today.  I haven't seen him probably since then, a person [sic] since that last trial.

Mr. Moran: And, Your Honor, may we approach the bench?

The trial court, after considering argument, denied the motion for mistrial but instructed the jury as follows:

> Ladies and gentlemen of the jury, I ask you not to consider, for any purpose whatsoever, any reference or remark that you have heard concerning a prior hearing in this case.  It has absolutely nothing to do with this case.  You are to concern yourself with the evidence in this case and only in this case and arrive at at [sic] fair and impartial verdict based strictly on the evidence that you hear here.

During the punishment phase, Mark Hicks, an employee of the state jail, testified as follows:

> Q.     And then I think you had mentioned something about the gangs and prostitution and all this kind of stuff and everything. And actually, the records are contained in those exhibits, that have already been introduced, show that on several different occasions, Mr. Moore has been evaluated, as far as sexual orientation, and has always been found to be appropriate by the sociologist who interviewed him, hasn't he?

16

A.     As far as I know, yes, sir.

Q.     Now, thisSSwell, this exhibit here, numberSSif I have it.  Did you help in putting this exhibit together?

A.     Yes, sir, I did, at the last trial.

Mr. Moran: May we approach the bench?

The court again instructed the jury that they were "not to consider for any purpose whatsoever the matter concerning any previous hearing or any previous proceeding in this case."

These three references to the prior trial are the only ones cited by Moore. He argues that the denials of his mistrial motions violated his right to the presumption of innocence under the Fifth Amendment.  The CCA heard and rejected that argument on direct appeal, holding that the statements were "passing and vague references," that they did not inform the jury of the outcome of the earlier trial, that Hicks's statement occurred after Moore had already been convicted and thus that the presumption of innocence did not apply, and that whatever prejudice resulted was cured by the prompt curative instructions.  See Moore v. State, No. 73,526, at 8-9 (Tex. Crim. App. Jan. 9, 2002).

In support of this claim, Moore cites United States v. Aragon, 962 F.2d 439 (5th Cir. 1992), and United States v. Faulkner, 17 F.3d 747 (5th Cir. 1994), both dealing with mid-trial publicity.  Neither was a habeas case, and neither even purported to apply "clearly established federal law as determined by the Supreme Court . . . ."  28 U.S.C. § 2254(d).  In neither was the prejudicial extrajudicial material anywhere near as innocuous as the statements at issue here.

In Aragon, we held that a district court abused its discretion by failing to inquire whether jurors had read a newspaper article concerning the defendants' criminal history, 962 F.2d at 441, and in Faulkner, we held that a trial court did not abuse its discretion when it failed to inquire whether jurors had seen a tele-

vision report that spoke of a prior trial, because of the court's repeated directions to the jury to disregard media reports, 17 F.3d at 763-65. We are aware of no precedent by the Supreme Court that requires that a mistrial motion be granted whenever that fact that there was a previous trial is mentioned to a jury, especially where absolutely no other information about that past trial is provided, and much less where the trial court quickly issues a curative instruction. No reasonable jurist could find it debatable that this claim has merit.[20]

## VI.

Moore contends a COA should issue on whether he received constitutionally effective assistance of counsel. In particular, he argues that his trial counsel failed to investigate adequately the facts surrounding the shooting. Moore claims that his lawyer should have questioned Josie Wilford and Darlene Hopkins, who were at the club before the shooting, and Edmond Davis, who could have testified that Clark and Boyd were armed that night. Moore also urges

---

[20] Not only could no reasonable jurist find it debatable that "clearly established" law might support Moore's claim, no reasonable jurist could conclude that the Constitution was even violated. Here, the only information that was conveyed to the jury was that Moore had been tried before. The jury did not learn that he was convicted before; in fact, it did not learn any specific information at all. For instance, a juror would not have known whether the reference to "last trial" even was an allusion to a trial for Moore, as opposed to one for Sheffield. Likewise, even if the jury believed it was an allusion to a previous trial for Moore, the jury did not know that Moore had been convicted, thereby prejudicing Moore's defense; it just as easily could have believed that an earlier jury was deadlocked as to Moore's guilt. Any prejudice to Moore thus was slight.

Balanced against that slight prejudice were the trial court's explicit and comprehensive curative instructions. Given that juries are presumed to follow instructions, Zafiro v. United States, 506 U.S. 534, 540-41 (1993), no reasonable jurist could debate that Moore's constitutional rights were not violated.

Because the law is so pellucid on these points, we need not delve into whether Moore's attorney invited Patterson's reference to the prior trial by asking whether he knew whether "Officer Glenn ha[d] never testified in any court proceeding or anything involving this case?" We also need not decide whether Hicks's statement, made after Moore was convicted but before he was sentenced, unconstitutionally deprived Moore of the presumption of innocence.

that if the lawyer would have but "exercised greater diligence, it is possible that he may have also discovered the existence of Warren Huel." If his lawyer would have investigated competently what happened, Moore claims that he could have presented more effectively his claim that he shot Boyd and Clark out of self-defense or, alternately, out of sudden passion.[21]

To demonstrate that his lawyer's conduct fell below what is constitutionally acceptable, Moore "must show that [his] counsel's performance was deficient, and that the deficiency prejudiced the defense," and "[t]o establish deficient performance," he "must demonstrate that [the] representation fell below an objective standard of reasonableness[, with] the proper measure of attorney performance [being] simply reasonableness under prevailing professional norms." Wiggins v. Smith, 539 U.S. 510, 521 (2003) (internal citations and quotations omitted). "[T]o establish prejudice, a 'defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.'" Id. at 534 (quoting Strickland v. Washington, 466 U.S. 668, 694 (1984)).

We must be mindful that "[t]he measure of performance is highly deferential, calibrated to escape 'the distorting effect of hindsight.' We must 'indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance' and that the 'challenged action might be considered sound trial strategy.'" Belyeu v. Scott, 67 F.3d 535, 538 (5th Cir. 1995) (quoting Washington, 466 U.S. at 689). To prevail, therefore, Moore must "allege[ or] tender[] evidence of concrete facts sufficient to overcome [the] presumption[]." West v. Johnson, 92 F.3d 1385, 1409 (5th Cir. 1996).

---

[21] When Moore raised this claim in his state habeas application, an evidentiary hearing was held, and, as a result of that hearing, the CCA denied the claim for the reasons stated by the state habeas trial court. See Ex parte Moore, No. 40,046-02 (Tex. Crim. App. May 14, 2003).

Moore cannot meet this burden, and undebatably so. When he made his Washington claim in his state habeas application, the court held an evidentiary hearing. Moore failed to provide any evidence at all regarding the thought process underlying his trial counsel's decisionmaking. He made no effort to inquire of his attorney as to what steps were taken to investigate the shooting, so we do not know whether the counsel made a strategic decision not to speak with these witnesses or what might have been the basis of that decision.

Crucially, we also do not know what Moore told his lawyer; if the lawyer learned from Moore directly that the killings were not in self-defense, it would not be surprising that the lawyer did not dredge unceasingly for witnesses who would say otherwise. If there was potentially exculpatory or mitigatory evidence SSwhich we do not know that there was, because Moore has never produced itSS we do not know why his counsel did not present it at trial. Moore did not avail himself of the opportunity to present evidence of ineffective assistance in the Texas courts.

We also do not know what Wilford, Hopkins, or Davis would have testified to, because Moore did not call them during that evidentiary hearing. He argues that they would have said something favorable, but we do not know that, and, for all we know, neither does Moore.[22] This complete failure to present any evidence strongly argues against Moore's present claims that his trial counsel's decisions were not objectively reasonable or that he was prejudiced.[23]

---

[22] The state habeas trial court found that Moore presented no evidence that Wilford, Hopkins, or Davis was available to testify or personally possessed relevant knowledge. Thus, the court found that Moore did not satisfy his burden under Washington, and the CCA adopted those findings and conclusions. Ex parte Moore, No. 40,046-02 (Tex. Crim. App. May 14, 2003).

[23] See, e.g., Anderson v. Collins, 18 F.3d 1208, 1221 (5th Cir. 1994) ("Anderson again makes only brief and conclusory allegations that [his lawyer's] representation was deficient because of his failure to investigate and develop useful evidence. Typically, he does not specify what this investigation would have divulged or why it would have been likely to make any difference in his trial or sentencing . . . . [W]ithout a specific, affirmative showing of what the
(continued...)

After all, absent at least some evidence that an objectively reasonable attorney would have interviewed these potential witnesses and tirelessly investigated the facts of the shooting with an eye towards self-defense, no one can say that Moore's attorney's choices were objectively unreasonable. Likewise, without a showing of at least some evidence, it is impossible to determine whether there was prejudice. No reasonable jurist, therefore, could debate that the CCA failed to apply Washington in an objectively reasonable manner.[24]

The application for a COA is DENIED.

---

[23] (...continued)
missing evidence or testimony would have been, 'a habeas court cannot even begin to apply [Washington's] standards' because 'it is very difficult to assess whether counsel's performance was deficient, and nearly impossible to determine whether the petitioner was prejudiced by any deficiencies in counsel's performance.'") (quoting United States ex rel. Partee v. Lane, 926 F.2d 694, 701 (7th Cir. 1991)). See also Neal v. Puckett, 286 F.3d 230, 237 (5th Cir. 2002) (en banc) ("In assessing counsel's performance, we look to such factors as what counsel did to prepare for sentencing, what mitigating evidence he had accumulated, what additional 'leads' he had, and what results he might reasonably have expected from these leads.").

[24] See, e.g., Bell v. Cone, 535 U.S. 685, 699 (2002) (holding that the burden is on the petitioner to do more than just "convince a federal habeas court that, in its independent judgment, the state-court decision applied[Washington] incorrectly," but instead the petitioner "must show that the [state court] applied [Washington] to the facts of his case in an objectively unreasonable manner").