# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

March 15, 2010

Charles R. Fulbruge III
Clerk

No. 09-70001

CLEVE FOSTER

Petitioner - Appellant

v.

RICK THALER, DIRECTOR, TEXAS DEPARTMENT OF CRIMINAL
JUSTICE, CORRECTIONAL INSTITUTIONS DIVISION

Respondent - Appellee

Appeal from the United States District Court
for the Northern District of Texas
USDC No. 4:07-CV-210

Before SMITH, STEWART, and SOUTHWICK, Circuit Judges.

PER CURIAM:[*]

Cleve Foster, a Texas inmate sentenced to death, seeks a certificate of appealability ("COA") in order to appeal the district court's denial of his petition for a writ of habeas corpus. We DENY a COA.

## FACTUAL BACKGROUND

On February 13, 2002, Cleve Foster and Sheldon Ward met Nyanuer "Mary" Pal at Fat Albert's, a Fort Worth bar where all three were regular

---

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

No. 09-70001

customers. According to the bartender, Pal interacted primarily with Ward until the bar closed at 2:00 a.m. She then walked to the parking lot with Ward where they talked for a few minutes. Afterwards, Pal left in her car, which was followed closely by Foster and Ward driving in Foster's truck.

Approximately eight hours later, Pal's nude body was discovered in a ditch far off a road in Tarrant County. She had been shot in the head. A wadded-up piece of bloody duct tape lay next to her body. Her unlocked car was later found in the parking lot of the apartment complex where she lived.

The police investigation focused on Foster and Ward once police learned that they had been with Pal that night. On February 21, 2002, police searched the motel room shared by Foster and Ward. Only Foster was present. He directed the police to a dresser drawer that contained a gun Ward had purchased from a pawn shop in August 2001.

Later that day, Foster voluntarily went to the police department to give a statement and to provide a DNA sample. In his statement, Foster first denied Pal had been inside his truck. However, he then admitted that she may have leaned inside. Finally, he admitted that "they" went cruising, but that "they" brought Pal back to her vehicle at Fat Albert's. Police also obtained a DNA sample from Ward sometime on the night of February 21, 2002.

In the early morning hours of February 22, 2002, Ward called a friend to ask if he could stay with him. Ward told the friend over the phone that he was in trouble because he killed someone. The friend arrived at the motel around 2:00 or 2:30 a.m. to pick up Ward. While in the truck, Ward told his friend that he followed a girl home from a bar, forced her into a truck at gunpoint, took her out to the country, raped her, and shot her. Ward did not mention Foster. The friend stopped the truck at a store and got the police to arrest Ward.

Ward then told police that he had been drinking heavily and using cocaine the night of the offense. He claimed that he and Pal arranged to meet after Fat

2

No. 09-70001

Albert's closed. Ward also told the police that he drove alone to Pal's apartment in Foster's truck to pick up Pal, and that he and Pal had consensual vaginal and anal sex on the front seat of Foster's truck before they drove back to the motel room where Foster was "pretty much passed out" on the bed. Ward claimed that he and Pal had consensual vaginal sex again in the motel room before they left to drive around. Ward recalled standing over Pal's body lying on the ground with a gunshot wound to her head and a gun in his hand. Ward claimed not to remember firing the gun. He told police that he stripped her body and dumped her clothes in a dumpster. Ward explained that he left a note in the motel apologizing to Foster for involving him. Ward also stated that he told his friend a few hours earlier that he had sex with a girl and killed her.

On March 22, 2002, Foster gave another written statement to police in which he claimed: (1) he and Ward followed Pal to her apartment after meeting her at Fat Albert's; (2) Pal voluntarily went with them to their motel room in his truck; (3) after taking sleeping pills and drinking beer, Foster fell asleep watching television while Ward and Pal kissed; and (4) Foster awoke to Pal performing oral sex on him.[1]

In addition to Foster's and Ward's statements, physical evidence also linked the two to the offense. DNA tests established that semen found in Pal's vagina contained Foster's DNA, and semen found in Pal's anus contained Ward's DNA. Ward may also have been a minor contributor to the semen found in Pal's vagina. DNA testing also revealed that Pal's blood and tissue were on the gun recovered during the motel room search. In addition, a police detective and medical examiner testified that Pal was not shot where her body was found because there was no blood splatter in the area. Since the soles of her feet indicated that she had not walked to the location where her body was found, the

---

[1] This March 22, 2002 statement was admitted only during the punishment phase of trial.

No. 09-70001

detective testified that he was "very comfortable" with stating that two people carried Pal's body to that location. In support of his testimony, the detective noted that the raised-arm position of Pal's body suggested she may have been carried by her feet and hands. In addition, the detective noted that Pal was five-seven and 130 pounds and Ward is only five-six and 140 pounds, while Foster is six feet tall and around 225 pounds.

In February 2004, Foster was convicted of the rape and capital murder of Pal. Based on the necessary jury findings during the punishment phase, the trial court sentenced Foster to death.[2]

Foster's conviction and sentence were affirmed on direct appeal. *Foster v. State*, No. AP-74901, 2006 WL 947681 (Tex. Crim. App. Apr. 12, 2006). His state habeas petition was denied by a summary order. *Ex parte Foster*, No. WR-65799-01, 2007 WL 841611 (Tex. Crim. App. Mar. 21, 2007). Thereafter, his petition for a federal writ of habeas corpus was denied by the U.S. District Court for the Northern District of Texas. *Foster v. Quarterman*, No. 4:07-CV-210-Y, 2008 U.S. Dist. LEXIS 97492 (N.D. Tex. Dec. 2, 2008). Finally, on January 21, 2009, the district court denied Foster's motion for a COA. Foster now seeks a COA from this court on what he frames as eleven separate issues.

## DISCUSSION

Foster must obtain a certificate of appealability in order to appeal the district court's denial of habeas relief. 28 U.S.C. § 2253(c)(1)(A). We will grant a COA only if the petitioner makes "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). That showing requires a petitioner to "demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Miller-El v. Cockrell*, 537 U.S. 322, 338 (2003) (citation omitted). "We resolve doubts about

---

[2] Separately tried, Ward was also convicted and sentenced to death.

4

whether to grant a COA in favor of the petitioner, and we may properly consider the severity of the penalty in making this determination." *Fuller v. Johnson*, 114 F.3d 491, 495 (5th Cir. 1997) (internal citation omitted).

The district court found that only two of Foster's claims were exhausted in state court: (1) Foster's trial counsel provided ineffective assistance during the penalty phase of trial, and (2) the Texas death penalty scheme is unconstitutional, because it sends mixed signals to the jury.

Before this court, Foster does not argue that any of the remaining nine claims were exhausted. Ordinarily, he could not receive habeas relief on the procedurally defaulted claims. 28 U.S.C. § 2254(b)(1)(A). Foster argues, though, that he falls under a limited "miscarriage of justice" exception to the exhaustion requirement. *See Schlup v. Delo*, 513 U.S. 298, 327-28 (1995). We will discuss that possibility. In the alternative, he argues that he has shown cause and prejudice for his failure to exhaust his claims, because his state habeas counsel was ineffective in not presenting the claims in those proceedings. Therefore, he claims his procedurally defaulted claims should be revived. *See Moore v. Quarterman*, 534 F.3d 454, 463-64 (5th Cir. 2008).

We address the issues concerning procedural default first.

A.    *Revival of Procedural Defaulted Claims*

If there is "evidence of innocence so strong that a court cannot have confidence in the outcome of the trial unless the court is also satisfied that the trial was free of nonharmless constitutional error, the petitioner should be allowed to pass through the gateway and argue the merits of the underlying claims," despite procedural defaults.[3] *Schlup*, 513 U.S. at 316. To make this

---

[3]    We have specifically rejected the argument that a showing of actual innocence would warrant habeas relief absent a constitutional violation. *Dowthitt v. Johnson*, 230 F.3d 733, 741 (5th Cir. 2000). "This rule is grounded in the principle that federal habeas courts sit to ensure that individuals are not imprisoned in violation of the Constitution — not to correct errors of fact." *Id.* at 741 n.4 (quoting *Herrera v. Collins*, 506 U.S. 390, 400 (1993)). Thus, the

No. 09-70001

claim, a petitioner must "support his allegations of constitutional error with new reliable evidence – whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence – that was not presented at trial." *Id*. at 324. Thus, the petitioner must demonstrate "that 'a constitutional violation has probably resulted in the conviction of one who is actually innocent.'" *Id*. at 327 (quoting *Murray v. Carrier*, 477 U.S. 478, 496 (1986)). Actual innocence means that "in light of the new evidence, no juror, acting reasonably, would have voted to find him guilty beyond a reasonable doubt." *Id*. at 329.

Foster provided the district court with the following evidence in an effort to establish his actual innocence: (1) Ward's February 22, 2002 confessions to his friend and to the police; (2) a handwritten note left by Ward in the motel room he shared with Foster; (3) a statement made by Ward in May 2005; and (4) a police report summarizing interviews with Jalissa Polk and her daughter. The district court found this evidence to be insufficient to meet the threshold requirement of demonstrating actual innocence.

First, Ward's confessions to his friend and the detective were both admitted at trial, and therefore neither confession was new evidence.

Second, the handwritten note left by Ward for Foster in the motel room did not constitute new, reliable evidence of actual innocence. In the note, Ward admitted to drugging Foster with Foster's own sleeping pills, having "Mary ride you while you slept," and "t[aking] your truck" all while Foster was passed out. Thus, the potentially exculpatory note explained the presence of Foster's semen in Pal's vagina and tended to show that he was passed out at the time of her murder.

---

petitioner must first raise substantial doubt about his guilt, and then this allows us to examine any procedurally barred constitutional claims. *Id*. at 741.

No. 09-70001

The contents of the note were not admitted into evidence,[4] but its existence was known and discussed at trial. However, simply because the evidence was not admitted does not make it "new." *See Moore*, 534 F.3d at 465 (evidence "within the reach of [petitioner's] personal knowledge or reasonable investigation" is not new). Yet, even if it was new evidence, the district court found that this was yet another statement contradicting statements made by both Ward and Foster. Therefore, the district court concluded that it was not persuasive evidence that Foster was actually innocent of Pal's murder.

In addition, the district court found that Ward's May 2005 statement was not a credible declaration of guilt. Ward explained that he and Foster had consensual sex with Pal in their hotel room, that there was no kidnapping or rape, that Foster later fell asleep, and that "if I used [Foster's] truck later that morning, he was not aware of it." However, the district court noted that the May 2005 statement contradicted both Ward's and Foster's earlier statements. Based on the numerous contradictory statements made by both Foster and Ward, the district court concluded that "yet another statement by Ward in which he minimizes both his and Foster's role in the crime is not a credible admission of guilt on his part." Thus, although the May 2005 statement was new evidence, it was not new, *reliable* evidence of Foster's actual innocence.

Finally, the district court found that the police report of Jalissa Polk and her daughter was not persuasive evidence of Foster's actual innocence. According to the police report, at approximately 8:30 p.m. on February 12 or 13, 2002, Polk's nine-year-old daughter witnessed a black man chase a nude black woman into the woods and then heard a gun shot. Pal was alive, though, and at Fat Albert's at 2:00 a.m. on February 14, 2002.

---

[4]    The trial court ruled the note was not an admissible statement against interest pursuant to Texas Rule of Evidence 803(24) because Foster's counsel was unable to authenticate the note.

The district court found that Foster did not produce "new, reliable evidence not presented at trial that establishes, that more likely than not, no reasonable juror would have found" Foster guilty beyond a reasonable doubt. Even considering the 2005 communication from Ward, and assuming that the other statements are new, the evidence does not meet the high bar imposed by *Schlup*. One more contradictory story would not have compelled jurors to find Foster not guilty. To qualify under the miscarriage of justice exception, evidence must be "'material, not merely cumulative or impeaching.'" *Vega v. Johnson*, 149 F.3d 354, 364 (5th Cir. 1998) (quoting *Lucas v. Johnson*, 132 F.3d 1069, 1076 n.3 (5th Cir. 1998)). In *Moore*, the court likewise considered both the lack of reliability and the contradictory nature of affidavit evidence offered after a trial, and concluded that such factors weighed against the persuasiveness of the evidence. *Moore*, 534 F.3d at 465. In addition, the police report from Polk's daughter does not even appear to be related to this case.

In the alternative, Foster claims that his otherwise defaulted claims should be revived because he can demonstrate cause and prejudice for his failure to exhaust them. Most of Foster's unexhausted claims relate to ineffectiveness of counsel. Foster contends that because Texas law does not typically permit ineffective assistance of counsel claims to be raised on direct appeal, his state habeas case was his first opportunity to raise them. *See Thompson v. State*, 9 S.W.3d 808, 814 (Tex. Crim. App. 1999). Petitioners are not typically entitled to effective assistance of counsel in state habeas proceedings. *Coleman v. Thompson*, 501 U.S. 722, 752 (1991). On the other hand, Justice Scalia, at least, has concluded that the Supreme Court "left open the question whether such ineffective assistance [in post-conviction proceedings] can establish a constitutional violation" when the state habeas claims are the first time a state court could examine a question on the merits. *Daniels v. United States*, 532 U.S. 374, 387 (2001) (Scalia, J. concurring).

No. 09-70001

We reject Foster's alternate theory because he did not present the argument in the district court. He first raised it here in his reply brief. Issues raised for the first time in a reply brief are waived. *Richards v. Quarterman*, 566 F.3d 553, 562 n.2 (5th Cir. 2009).[5]

Foster fails in the attempt to overcome the procedural bar of failing to exhaust his claims in state court. He has not shown that he is qualified to pass through the actual innocence gateway nor has he shown that he can successfully use the cause and prejudice standard to revive these defaulted claims. The district court was correct in holding that all but two of Foster's claims were procedurally defaulted.[6] Reasonable jurists would not find the district court's assessment of this issue debatable or wrong. Accordingly, we will not issue a COA for any of Foster's procedurally defaulted claims.

### B.    *Ineffective Assistance of Counsel Claim*

In a properly exhausted claim, Foster contends that his trial counsel were ineffective by failing to conduct an adequate investigation into mitigating evidence for use at the punishment phase of his trial, and because the mitigation evidence they uncovered was not properly presented to the jury. The specific defaults are these: (1) they failed to place his military records, school records, and records from his successful completion of probation into evidence, and (2) they failed to present evidence of the abuse and neglect he suffered as a child.

To prevail on an ineffective assistance of counsel claim, a petitioner must demonstrate that "(1) counsel's performance was deficient and (2) counsel's deficient performance caused actual prejudice to the petitioner's defense."

---

[5]    Foster's argument would have failed even if it had been properly raised. We have rejected this argument on the merits. *Martinez v. Johnson*, 255 F.3d 229, 241 (5th Cir. 2001).

[6]    Despite finding that Foster did not meet the actual innocence threshold, the district court did address the merits of his procedurally defaulted claims pursuant to 28 U.S.C. § 2554(b)(2). The district court concluded that Foster was not entitled to habeas relief on any of these claims.

*Richards*, 566 F.3d at 564 (citing *Strickland v. Washington*, 466 U.S. 668, 687 (1984)). Counsel's performance was deficient if it was objectively unreasonable at the time of the representation. *Id.*

The complaint in *Strickland* about counsel was a failure to investigate adequately for mitigation evidence. The Supreme Court analyzed that claim.

> [S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments.

*Strickland*, 466 U.S. at 690-91. Thus, the key focus with this kind of claim is not on what was presented at trial, but on whether the investigation preceding the trial was reasonable. *Wiggins v. Smith*, 539 U.S. 510, 522-23 (2003).

If it is determined that trial counsel's performance was deficient, the petitioner must then demonstrate that he was actually prejudiced by trial counsel's deficiencies. *Richards*, 566 F.3d at 564. "To demonstrate prejudice, a petitioner 'must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" *Id.* (quoting *Strickland*, 466 U.S. at 694). "'A reasonable probability is a probability sufficient to undermine confidence in the outcome.'" *Id.*

In its opinion denying habeas relief, the district court examined all of Foster's claimed deficiencies along with the explanations provided by trial counsel in their affidavits. First, the district court found that Foster's trial counsel made a strategic decision not to obtain and place his military records into evidence. In their affidavits, his trial counsel explained that, based on

knowledge gained from Foster and discussions with his military superiors and colleagues, introducing the records in full would have opened the door to these troublesome issues: (1) Foster's Bronze Star was awarded for merit and not for valor; (2) scant support for Foster's claims to have been in combat; and (3) allegations that Foster gave alcohol to underage students as a recruiter, and that he had sex with an underage potential recruit. As a result of these allegations, court-martial proceedings were instituted against Foster, and he was denied an opportunity to re-enlist in the Army.

Rather than introduce these records in full or provide them to the defense psychologist, Foster's counsel made what the district court determined was a strategic decision to highlight the positive aspects of his military career by having the mother of a solider he recruited testify about Foster's positive impact on her family's life. Friends and family members also testified that Foster served in the military for a substantial period of time, served in Iraq, received a Bronze Star for his service, and experienced post-traumatic stress disorder because of "gruesome experiences" he had in the military.

As to the limited use of high school records, Foster's counsel explained the decision by noting the long period of time since Foster had graduated from high school, that there was testimony from Foster's friends and family about his "struggles" in school, and that the defense was not alleging any mental defect or impairment.

As to the probation records, Foster's trial counsel explained that they had obtained a letter that had recommended Foster for an early discharge from probation. They were concerned that introducing it would allow questions that Foster's probation had previously been in danger of being revoked due to a failure to report and pay fees. Moreover, even though the letter was not introduced by defense counsel, it was introduced by the State as part of the evidence concerning the conviction that gave rise to the probation.

11

Finally, Foster alleged that his counsel inadequately investigated and failed to introduce evidence concerning his difficult childhood. This included evidence gleaned from interviews of Foster's mother and sister which had been conducted by a psychologist hired during state habeas proceedings. The psychologist also evaluated Foster and produced a report unifying his observations of all three. The investigation showed that Foster had been physically abused as a child, including being hit with belts and tree branches; that his father was an alcoholic; that Foster had witnessed his father sexually abuse his brother on multiple occasions; and that Foster later learned his father sexually abused his sisters as well. Foster has never claimed that he was sexually abused himself.

Foster's counsel explained that they contacted all family members they could locate, as well as numerous friends, to testify on Foster's behalf. However, they were unable to contact Foster's sisters, because the sisters were homeless and had long been out of contact with Foster. Foster's brother had been murdered years earlier, and his mother could not travel to testify at trial because she had medical problems. In addition, a number of Foster's childhood friends were either unable to travel or did not seem certain to give entirely favorable testimony. Those who did testify for the defense at the penalty phase included Foster's father; Margaret Barnes, a family friend who helped raise Foster; Barnes's sister and brother-in-law, who knew the family; and Charles Samples, Foster's childhood friend. These witnesses provided testimony about Foster's positive characteristics and the trauma he suffered when he discovered his murdered brother's decomposing body parts ten years earlier. In addition, the defense's psychologist testified that Foster's father was physically abusive and that the children suffered in various ways because of both parents' drinking. The psychologist also mentioned the sexual abuse of Foster's siblings.

No. 09-70001

Upon review of Foster's claims of ineffective assistance and the trial counsel's affidavits, the district court concluded that the strategic decisions made by Foster's trial counsel were not so poorly chosen as to have "permeated Foster's trial with obvious unfairness."

On appeal, Foster argues that his counsel's failure to *obtain* the military and school records cannot be justified as a strategic choice, because such choices can only be made after a full investigation. However, failure to obtain these documents does not constitute ineffective assistance if trial counsel makes a reasonable decision that the investigation is not necessary. *See Strickland*, 466 U.S. at 690-91. Here, trial counsel's affidavits explain the basis for their decision not to obtain the records; they already knew from others, including Foster, what the records were likely to contain. Nothing now suggests that Foster's trial counsel were wrong about the contents of the records.

The district court properly concluded that Foster failed to meet the first prong of the *Strickland* test by failing to demonstrate deficient performance. Reasonable jurists would not find the district court's assessment of Foster's ineffective assistance claim debatable or wrong. Accordingly, a COA will not be issued for this claim.

*C. Claim that the Texas Death Penalty Scheme Sends Mixed Signals*

Foster's second properly exhausted claim is that the Texas death penalty scheme is unconstitutional because it sends mixed signals to the jury. Without providing any citations, Foster's counsel argues that this claim is foreclosed by Fifth Circuit precedent, but that she wishes to preserve it for possible future review. In the district court, Foster cited *Penry v. Texas*, 532 U.S. 782 (2001). However, he failed to explain what "mixed signals" the special issues sent to his jury. In addition, the district court held that the mitigation special issue presented to Foster's jury did not suffer from the same defects that concerned the Supreme Court in *Penry*.

13

No. 09-70001

Reasonable jurists would not find the district court's assessment of this claim debatable or wrong.  Therefore, a COA will not be issued for this claim.

We DENY a COA on all of Foster's claims.