IN THE COURT OF CRIMINAL APPEALS


OF TEXAS






NO. WR-65,799-02






EX PARTE CLEVE FOSTER









ON APPLICATION FOR POST-CONVICTION WRIT OF HABEAS CORPUS IN
CAUSE NO. C-1-007519-0839040-B

IN THE CRIMINAL DISTRICT COURT NUMBER ONE

TARRANT COUNTY




 Cochran, J., filed a statement concurring in the dismissal.


STATEMENT



 I join the Court's order dismissing applicant's subsequent application for a writ of
habeas corpus because it is procedurally barred by Texas Code of Criminal Procedure Article
11.071, § 5. Applicant alleges that his "trial counsel were ineffective for failing to obtain and
present testimony from a blood spatter expert." He has attached a bare-bones, conclusory
report from a blood-spatter expert expressing the opinion that, from his review of certain trial
materials, (1) the deceased victim was shot and killed at the location where her body was
found. This opinion conflicts with the opinions offered by the medical examiner and
detective at applicant's trial in 2004. This subsequent application fails to satisfy Section 5
of article 11.071. 

 First, the applicant's "blood spatter" based ineffective assistance claim is not newly
available. While the actual written report of applicant's blood-spatter expert attached to his
subsequent application is technically "new," a claim that trial counsel were ineffective for
failing to present a blood-spatter expert at trial could have been raised in applicant's initial
writ application, and a report could have been obtained then. 

 Second, applicant's newly-obtained expert report fails to support a Schlup (2)
 actual
innocence claim that, but for his trial counsels' ineffectiveness, no rational juror could have
found him guilty. To the contrary, applicant's expert report simply creates a potential for a
testimonial "battle of the experts" concerning where the deceased was killed. It does nothing
to exculpate applicant as a party to her murder. In sum, applicant has failed to plead a
cognizable claim that would surmount the Section 5 procedural bar, much less present a
prima facie case to support his allegations.

Pertinent Facts (3)


 Applicant and Sheldon Ward were close friends and regulars at a bar named Fat
Albert's located in Fort Worth. On the night of February 13, 2002, applicant and Ward were
at Fat Albert's when Nyanuer "Mary" Pal, who was also a regular, arrived around 9:00 or
10:00 p.m. The bartender testified at trial that the three socialized and that Ward and Mary
engaged in what the bartender called suggestive "dirty dancing." The bartender testified that
Ward had the most interaction with Mary during the evening and that at times he, but not
applicant, behaved inappropriately towards her. When the bar closed at 2:00 a.m., applicant,
Ward and Mary walked out together. They talked in the parking lot for a few minutes. Mary
left in her car followed closely by applicant and Ward in applicant's truck, which applicant
was driving. Approximately eight hours later at around 10:00 a.m., Mary's nude body was
discovered in a ditch "quite a ways off the road." Mary had been shot in the head, and there
was a wadded up piece of bloody duct tape next to her body. In the early morning hours of
February 15th, Mary's unlocked car, with her cell phone sitting on the front seat, was found
in the parking lot of the apartment complex where she lived. Subsequent DNA testing
established that semen containing applicant's DNA was found inside Mary's vagina and
semen containing Ward's DNA was found inside her anus. Ward could not be excluded as
a minor contributor of semen found inside Mary's vagina.

 Within a week of Mary's murder, the police investigation had focused on applicant
and Ward, primarily because the police learned that they were seen following Mary out of
the Fat Albert's parking lot. On the evening of February 21st, the police arrived at a motel
where applicant and Ward shared a room and spoke to applicant. Ward was not there. The
police found various items soaking in a cleaning fluid in a cooler in the back of applicant's
truck. These items consisted of three pairs of shoes, bungee cords, black gloves, a bicycle
pump, a hatchet, a sheathed knife, two slingshots, a trailer hitch, coat hangers, a brown strap,
a bleach bottle, and a liquid detergent bottle. The State's DNA expert testified at trial that
items soaked in cleaning fluids containing bleach could make DNA recovery almost
impossible. Applicant also directed the police to a dresser drawer in the motel room that
contained a gun that Ward had purchased from a pawn shop in August 2001. DNA testing
established that the blood and tissue on the gun was Mary's. The police also found bloody
clothes in Ward's car. The blood on these clothes was Mary's.

 Applicant went to the homicide office on February 21st to provide a DNA sample. 
Applicant was not under arrest at this time. Applicant spoke to Detective McCaskill at the
homicide office. McCaskill testified that applicant made several inconsistent statements
during the February 21st interview. Applicant initially denied that Mary had been inside his
truck, he later stated that she may have leaned inside it, and he ultimately stated that "they"
went cruising but that "they" brought Mary back to her vehicle at Fat Albert's. McCaskill
testified that he did not believe this latter statement about dropping Mary off at her vehicle
at Fat Albert's after "they" went cruising because Mary's vehicle was found outside her
apartment. Applicant never admitted to having vaginal sex with Mary during four separate
interviews with McCaskill.

 The police also obtained DNA samples from Ward apparently some time on the night
of February 21st. The next day, Ward decided to move from the motel room that he shared
with applicant. Duane Thomas testified, as a rebuttal witness for the prosecution, that he was
an acquaintance of Ward's and that Ward called him in the early morning hours of February
22nd asking if he could stay with Thomas. Thomas testified that Ward told him over the
telephone that he was in trouble because he had killed someone. Ward and applicant were
at the motel room when Thomas arrived there at about 2:00 or 2:30 a.m. on February 22nd to
pick up Ward. After they left, Ward told Thomas that he followed a girl home from a bar,
forced her into a truck at gunpoint, took her out to the country, raped her and blew her brains
out. Ward did not mention to his friend Thomas that applicant was involved in the offense
or anything else that would explain the presence of applicant's DNA inside Mary's vagina.

 Ward was arrested early that morning, and he gave an audiotaped statement to the
police. In this statement, Ward told the police a somewhat different story than the one he
told his friend Thomas a few hours before. Ward told the police that he was drinking heavily
and using cocaine on the night of the offense. He stated that he and Mary made
arrangements to "meet up" after Fat Albert's closed. According to Ward, after Fat Albert's
closed, he and applicant went back to their motel room where applicant "pretty much passed
out" on the bed. Ward drove alone to Mary's apartment complex in applicant's truck and
picked Mary up. Ward claimed that he and Mary had consensual vaginal and anal sex on the
front seat of applicant's truck, and that they drove to the motel room where they had
consensual vaginal sex. Ward and Mary left the motel and drove around "a little bit." Ward
next recalled standing over Mary's body lying on the ground with a gunshot wound to her
head and the gun in his hand. Ward did not remember firing the gun. Ward stripped Mary's
body and left. He said that he dumped Mary's clothes in a dumpster the location of which
he could not recall. He stated that he put his bloody clothes in his car at the motel. Ward
also stated that just before he moved out of the motel room on February 22nd, he left applicant
a letter apologizing to him for involving him. Ward also stated that he had told Thomas a
few hours before that he had sex with a girl and killed her.

 Detective McCaskill testified that Mary's nude body was found "quite a ways off the
road" in a ditch. He testified that Mary's body did not appear to have been in the location
where it was found for "more than a few hours." 

 McCaskill testified that there "was no forensic evidence found in or on [applicant's]
truck that linked [applicant] to this crime." He opined that it was very unlikely that "a person
could shoot and kill another" and "not get something on them, and then take a body that is
bloody from one location to another and dump it and not get anything on their clothing or
anything in their truck." He also testified that it was possible that only one person could have
carried Mary's body where it was found even though he was "very comfortable" with saying
that two people carried her body to the location where it was found. He said that the raised-arm position of Mary's body suggested that she was carried to the woody area by her feet and
hands. McCaskill also believed that Mary's body was carried to the location where it was
found after Mary was shot elsewhere because there was no "blood splatter around the area." 
Furthermore, the soles of Mary's feet indicated that she had not walked to the location where
her body was found. The medical examiner also testified that there would have been "a
profuse amount of blood" associated with Mary's gunshot wound.

 The evidence also showed that Mary was five feet, seven inches tall and weighed 130
pounds. Ward is roughly five feet, six inches tall and weighed 140 pounds. Applicant is
roughly six feet tall and weighed approximately 225 pounds. McCaskill testified that he
believed it possible "that two people might have carried [Mary's body] out there." McCaskill
also believed it significant that a Whataburger cup in good condition was found "no more
than 30 to 40 yards" from Mary's body because applicant had stated in one of his statements
to the police "that he would on occasion frequent Whataburger." McCaskill also testified 
that applicant and Ward had a unique relationship and that applicant was kind of a mentor
to Ward. McCaskill testified that Ward and applicant had been roommates in at least three
different places and that they did "practically everything together." The bartender testified
that she could not think of a time when she saw applicant without Ward.

Previous Habeas Corpus Proceedings


 In his initial state habeas corpus filing, applicant raised a claim that he was actually
and factually innocent of the crime. (4) His evidence was a statement from his co-defendant
Ward, signed after the date of conviction, in which Ward claimed that he had only had
consensual sex with the victim and that there had been no kidnapping and no rape. The trial
court found that the evidence was not newly discovered because all of the information in the
letter had been presented in some fashion at applicant's trial. Further, the note did not
account for the discrepancies between the testimony presented at trial and Ward's account
of the crime. This Court adopted the trial court's findings and denied relief on the "actual
innocence" allegation and the application.

 Applicant then moved to federal court where he presented this same evidence of
"actual innocence" and also claimed that his trial attorneys had provided ineffective
assistance of counsel. (5) In that federal filing, applicant asserted that he had met the
requirements for the "fundamental-miscarriage-of-justice exception" under Schlup, and
therefore was entitled to raise various claims in federal court that he had neglected to raise
in state court, even though the factual and legal basis for those unexhausted claims had been
previously available. (6) In his initial federal filing, he relied upon the same "actual innocence"
materials that he now presents to this Court. The federal district court rejected applicant's
Schlup claim, as did the Fifth Circuit. (7) The United States Supreme Court denied certiorari. (8)

The Current Application


1. Section 5(a)(1).

 Applicant asserts that the current claims and issues have not been and could not have
been presented previously in a timely initial application or in a previously considered
application because the factual or legal basis for the claim was unavailable on the date he
filed the previous application. 

 But the "blood spatter" based ineffective assistance claim is not newly available. The
actual written report of applicant's blood-spatter expert attached to his subsequent
application is technically "new," but a claim that trial counsel was ineffective for failing to
present a blood-spatter expert at trial could have been raised in applicant's initial writ
application, and a report could have been obtained then. In his original writ application,
applicant did raise various ineffective assistance of counsel claims, but they were rejected
because trial counsels' explanations of their pretrial investigation leading to their strategic
trial choices were found to be appropriate. (9) Given applicant's ability to raise numerous
ineffective assistance of trial counsel claims in his original state and federal writ applications,
he presumably could have raised an ineffective assistance claim concerning possible blood-spatter evidence in those filings as well. Then his trial counsel would have had an
opportunity to address that claim. (10) 

 Applicant asserts that habeas counsel did not raise the issue because they simply were
not competent. He asks this Court to overturn its decision in Ex parte Graves, (11) which held
that an applicant may not bring a second or subsequent application for habeas corpus relief
alleging that his previous habeas counsel was ineffective for failing to raise additional claims
that the applicant would now like to bring. This we decline to do. (12) Indeed, this case is a
good example of why the Habeas Corpus Reform Act of 1995 was enacted: to avoid an
endless parade of subsequent habeas corpus applications, each one raising piecemeal claims
that could have been, but were not, raised in an original application. Applicant did raise
ineffective assistance of counsel claims in his original state application; he re-raised those
claims in federal court, but added in additional ineffective assistance of counsel claims. 

 After the federal courts held that these claims were both procedurally barred and
without merit, applicant has returned to this Court to file yet another claim of ineffective
assistance of counsel-now alleging both the ineffectiveness of trial counsel and of his
original habeas counsel. As we noted in Ex parte Graves, allowing litigants to make repeated
and repetitious rounds of habeas filings in death penalty cases, each alleging the
ineffectiveness of prior counsel as a gateway to consideration of an underlying constitutional
claim, would create a "perpetual motion machine" to forever avoid finality of the judgment. (13) 
In 2002, we stated that if the Texas Legislature had wished to add a special exemption or
exception to Section 5 based upon an allegation of ineffective assistance of a former habeas
counsel, it could certainly have done so. (14) It did not do so, nor has it, in the past eight years,
amended the statute to include such an exception to the Section 5 procedural bar. We should
not judicially enact such an exception to the legislative statute.

2. Section 5(a)(2).

 Applicant further asserts that, by a preponderance of the evidence, but for a violation
of the United States Constitution no rational juror could have found him guilty beyond a
reasonable doubt. But applicant has not made a prima facie showing of actual innocence.

 To obtain relief based on ineffective assistance of counsel, a prisoner must satisfy the
two-prong test established in Strickland v. Washington. (15) Under Strickland, a defendant must
prove by a preponderance of the evidence both that counsel's performance was deficient and
that this deficient performance prejudiced his defense. (16) Courts, however, should "indulge
a strong presumption" that counsel's conduct falls within the range of reasonable assistance,
and a defendant must overcome the presumption that an action is sound trial strategy. (17) To
establish prejudice, a defendant must show that "there is a reasonable probability that, but for
counsel's unprofessional errors, the result of the proceeding would have been different. A
reasonable probability is a probability sufficient to undermine confidence in the outcome." (18)
The prejudice prong "focuses on the question whether counsel's deficient performance
renders the result of the trial unreliable or the proceeding fundamentally unfair." (19) In
Wiggins v. Smith, (20) and Rompilla v. Beard, (21) the Supreme Court applied the Strickland
standard to claims that trial counsel was ineffective by failing to investigate, and then
present, potentially mitigating evidence. 

 If this Court were to consider the merits of applicant's ineffective assistance claim
under Strickland, Wiggins, and Rompilla, that claim would fail. The State took the position
at trial that one person (or at least Ward) could not have moved the deceased victim's body
to the place it was found. Therefore, applicant must have been involved. The thrust of
applicant's claim here is that a blood-spatter expert would have shown that the victim could
have been killed where she was found thereby undermining the State's theory of the case. 
Even if this were true, it does not refute applicant's inconsistent statements, his statements
about cruising with Ward and the victim, or the fact that his DNA was found inside the
victim. It only touches on one aspect of the case - whether the body was moved or not. At
best, applicant has shown that a blood-splatter expert would have created a "battle of the
experts" scenario which the jury would have had to resolve in the context of all of the
evidence and credibility determinations (a sufficiency question, not one of actual innocence). 
As the Fifth Circuit stated in rejecting applicant's Schlup claim, "[o]ne more contradictory
story would not have compelled jurors to find [applicant] not guilty. To qualify under the
miscarriage of justice exception, evidence must be 'material, not merely cumulative or
impeaching.'" (22) Applicant's expert blood spatter evidence merely impeaches the State's
experts on the issue of where Mary was murdered, not who murdered her. Without more,
applicant has not met the prejudice prong of Strickland, he has not made a prima facie
showing of actual innocence, and he has not established by a preponderance of the evidence
that no rational juror could have found him guilty even if he had offered expert blood spatter
evidence at trial.

 With these comments, I respectfully join the Court's order dismissing applicant's
subsequent application for a writ of habeas corpus because it is procedurally barred by Texas
Code of Criminal Procedure Article 11.071, § 5.


Delivered: December 30, 2010

Do not publish
1. This expert, Gary A. Rini, states that he reviewed the Tarrant County Medical Examiner
Investigator's Report, the Fort Worth Police Department Crime Laboratory Firearms Unit Report,
the Tarrant County Medical Examiner's Autopsy Report, and one compact disc containing digital
images of the scene where the victim was found.
2. Schlup v. Delo, 513 U.S. 298, 327-28 (1995). 

3. This summary is taken almost verbatim from the Court's opinion on direct appeal. It is
similar to the summary of facts set out by the federal district judge in the opinion denying habeas
relief in federal court. See Foster v. Quarterman, No. 4:07-CV-210-Y, 2008 WL 5083078 (D.C.
Tex. Dec. 2, 2008) (not designated for publication). The federal district court rejected
applicant's habeas corpus claims alleging his trial counsel's ineffectiveness and raising a Schlup
claim to circumvent the applicable procedural bar for failing to exhaust some of his ineffective
assistance claims in state court. See id. 
4. Applicant also raised claims of ineffective assistance of trial counsel based on their
purported failure to offer certain mitigating evidence during the punishment phase. In particular,
he claimed that his trial attorneys were ineffective for failing to investigate, obtain, and offer into
evidence certain military and school records and probation reports, as well as failing to offer
sufficient evidence of the abuse and neglect that applicant experienced as a child. He included,
among the exhibits in his original state habeas filing, (1) a letter from Sheldon Ward signed on
October 19, 2005; (2) a post-conviction psychological evaluation report written by Dr. Troy
Martinez based on a personal interview with applicant; (3) numerous psychological tests taken by
applicant; (4) interviews with applicant's mother and sister; (5) applicant's military records; and
(6) notes from Dr. Stephen Karten, the forensic psychologist hired to testify on Foster's behalf at
trial.
5. Applicant alleged a total of twelve grounds for relief in federal court, but the federal
district court held that most of them had not been presented to the state courts and thus were not
exhausted. See Foster v. Thaler, 369 Fed. Appx. 598, 2010 WL 924885, at * 5 (5th Cir. March
15, 2010) (not designated for publication).
6. See Foster v. Quarterman, 2008 WL 5083078, at *7.
7. Id. at *7-8; Foster v. Thaler, 369 Fed. Appx. 598, 2010 WL 924885, at *5 (applicant
"fails in the attempt to overcome the procedural bar of failing to exhaust his claims in state court. 
He has not shown that he is qualified to pass through the actual innocence gateway nor has he
shown that he can successfully use the cause and prejudice standard to revive these defaulted
claims.").
8. Foster v. Thaler, __ U.S. __, 2010 WL 3698830 (Dec. 13, 2010).
9. A lengthy discussion of these claims and trial counsels' explanations for their strategic
choices may be found in Foster v. Quarterman, 2008 WL 5083078 at *10-17.
10. Significantly, applicant does not allege that his trial counsel failed to investigate the
issue of blood spatter evidence, he only asserts that counsel failed to "obtain and present" such
material. We have no evidence before us that counsel failed in their duty to investigate. Given
the cogency of their explanations for other strategic choices and decisions that they made before
and during trial, they may well have investigated and (1) found nothing in the blood evidence to
support a claim that the victim was shot in situ, or (2) rejected the notion of raising a "battle of
the experts" concerning the significance of the blood spots found on the leaves and ground where
the victim was found.
11. 70 S.W.3d 103 (Tex. Crim. App. 2002).
12. Applicant notes that Justice Scalia has recently granted a stay of execution in Bradford
v. Thaler, pending disposition of Bradford's petition for writ of certiorari which asks the
Supreme Court to consider "[w]hether the ineffective assistance of counsel in post-conviction
proceedings constitutes 'cause,' when, as a matter of state law, post-conviction proceedings
provide the only state forum in which a death-sentenced inmate can present the federal
constitutional claim that his trial lawyer was incompetent." See Bradford v. Thaler, No.
08-70030, 366 Fed.Appx. 521, 2010 WL 609163 (5th Cir. 2010), petition for cert. filed, (U.S.
Jun. 18, 2010); United States Supreme Court Docket Sheet for Bradford v. Thaler, No. 09-11519
(application for a stay of execution of sentence of death granted by Justice Scalia, pending the
disposition of the petition for a writ of certiorari). Applicant is, of course, free to seek a stay of
execution from the United States Supreme Court pending the disposition of Bradford.
13. Ex parte Graves, 70 S.W.3d at 114-15 ("Under applicant's interpretation, a person
sentenced to death would be appointed 'competent counsel,
' paid by the state, to investigate and
raise all potential claims in an original writ. But if that original writ is rejected and the applicant
later contends that counsel could have and should have raised additional facts or legal claims, he
may file a subsequent writ to determine whether the original habeas counsel was ineffective for
failing to bring those claims. Then, if that second writ is rejected, he may file a third writ
contending that the second habeas counsel was ineffective for failing to investigate other new
claims or facts that he now asserts are meritorious. And so forth. A claim of ineffective
assistance of the prior habeas counsel would simply be the gateway through which endless and
repetitious writs would resurrect.").
14. Id. at 115 ("If the Legislature had intended ineffective assistance of habeas counsel
claims to be an exception to the bar on subsequent applications, it could have made that
exception explicit just as it did with the three statutory exemptions that it specified. It did not do
so. We do not have the authority to judicially create a fourth exception to the statute.") (footnote
omitted).
15. 466 U.S. 668 (1984).
16. Id. at 687.
17. Id. at 689.
18. Id. at 694.
19. Williams v. Taylor, 529 U.S. 362, 393 n .17 (2000) (citations and internal quotation
marks omitted).
20. 539 U.S. 510 (2003).
21. 545 U.S. 374 (2005).
22. Foster v. Thaler, 2010 WL 924885 at *602-03.